IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                          CRIMINAL ACTION NO. 2:24-cr-00025

NATHANIEL MARTIN,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant's Motion to Suppress All Fruits of September 6, 2022 Warrantless "Stop," Search, & Related Seizures* (Document 44), the United States' *Response to Defendant's Motion to Suppress All Fruits of September 6, 2022 [2021] Warrantless "Stop," Search, & Related Seizures* (Document 55), and the *Defendant's Reply on Motion to Suppress* (Document 60), as well as the attached exhibits. In addition, the Court has considered the evidence and testimony presented during the suppression hearing held on October 2, 2024. For the reasons stated herein, the Court finds that the motion should be denied.

The Court has also reviewed the Defendant's *Motion to Schedule Evidentiary Hearing* (Document 53), wherein the Defendant requested that a hearing on the motion to suppress be scheduled for September 16, 2024. That motion will be terminated as moot, given that the Court scheduled and held the requested hearing on October 2, 2024.

## FACTUAL BACKGROUND

On February 7, 2024, an *Indictment* (Document 1) was returned, charging the Defendant, Nathaniel Martin, with possession of a firearm as a convicted felon. The Indictment alleges that Mr. Martin possessed a Smith & Wesson .40 caliber pistol in or near Richwood, Nicholas County, West Virginia on or about September 6, 2021. The Indictment further alleges that Mr. Martin was previously convicted, on or about June 2, 2009, of two counts of Delivery of a Schedule II Controlled Substance in violation of W. Va. Code § 60A-4-401, a felony offense punishable by a term of imprisonment exceeding one year.

On September 6, 2021, Mr. Martin was a passenger in a vehicle driven by Melisa Jarvis, in the Gauley District of the Monongahela National Forest in Nicholas County, West Virginia. U.S. Forest Service Law Enforcement Officer Joshua Radford was patrolling the area in a maintenance truck because his law enforcement vehicle was in the shop. Officer Radford briefly encountered Ms. Jarvis and Mr. Martin in the afternoon. They were pulled off the road, and Officer Radford stopped to briefly chat and see if they were lost or needed information. They indicated that they were looking for mushrooms, and Officer Radford resumed his patrol. Officer Radford encountered Ms. Jarvis and Mr. Martin again about 45 minutes later, shortly before 4:00 p.m. They were stopped on a single-lane bridge about a mile and half from the first encounter, and Officer Radford conducted a stop for obstructing the bridge. Officer Radford testified that they moved their vehicle to the side of the road after he pulled up behind them. He took a still photograph of the vehicle and license plate before getting out of his truck, which is his normal practice when he does not have a computer or service available to input the information. Ms. Jarvis and Mr. Martin both exited the vehicle, and Mr. Martin moved down the embankment.

Officer Radford turned on his body camera after he exited his truck and began speaking with Ms. Jarvis, but it took approximately thirty seconds before it began recording audio. Based on his testimony, which the Court found credible,[1] approximately two minutes of the traffic stop were not captured on the bodycam video. Before the video began, Officer Radford told Ms. Jarvis that the stop was for blocking the road, asked about firearms in the vehicle, and asked for her license or identification. She indicated that there was a firearm in the vehicle. The audio begins with Officer Radford asking whether there is anything else in the vehicle. Ms. Jarvis then returns to the vehicle and reaches through the open driver's side window to access her purse and find her license. Officer Radford asked Mr. Martin for his license, which he produced, and Ms. Jarvis reentered the vehicle to get her registration and insurance information. Officer Radford testified that he anticipated writing a warning for blocking the roadway.

Officer Radford asked Ms. Jarvis where the firearm was located, and she stated that it was under the driver's seat. He retrieved the gun and indicated that he would check the serial number, although he ultimately did not provide the serial number to dispatch. He again asked whether there was anything else in the car, and Ms. Jarvis admitted that there was another firearm underneath the passenger seat, which she indicated belonged to Mr. Martin's mother. Officer Radford testified that he was concerned that she had been evasive and previously denied anything else dangerous being in the car, but did not feel his safety was at risk, although he was careful to watch Ms. Jarvis and Mr. Martin.

---

[1] Officer Radford provided clear and direct answers to questions both on direct and cross. He did not appear defensive or evasive, and his responses were consistent with the other available evidence. Therefore, the Court found him credible and credits his account of his interactions, to the extent they were not captured on video.

Officer Radford then walked near his truck to radio the dispatcher. Because there was no cellular service in the remote area and radio reception was sometimes spotty, he could not run checks on anything himself and relied on radio contact with the dispatcher. He photographed the driver's licenses, then radioed dispatch to request "27s," or driver history reports, and to verify that neither Ms. Jarvis nor Mr. Martin were prohibited from possessing firearms. He testified that the check on the validity of a driver's license and the criminal history report typically came back at the same time. He did not request a check on the serial number of the firearm or the insurance or registration, although he reviewed the physical registration and insurance cards. The firearms remained in the car, and he instructed Ms. Jarvis and Mr. Martin to remain outside the vehicle. While awaiting a response from dispatch, Officer Radford engaged in more conversation with Ms. Jarvis and Mr. Martin. He indicated that although the reason for the stop was obstructing the roadway, he was concerned with ginseng poaching because the areas in which he encountered them were areas with ginseng. Ms. Jarvis stated that she does not harvest ginseng. Officer Radford testified that he was making conversation and trying to gain more information from Ms. Jarvis and Mr. Martin in asking about ginseng but was not actually aware of a history of ginseng poaching in the immediate area.

Dispatch radioed Officer Radford at approximately 12:25 minutes into the traffic stop video and informed him that Mr. Martin had prior felony convictions. The dispatcher did not report back on Ms. Jarvis's driver's license. Officer Radford requested that the dispatcher send another officer in his direction. He placed Mr. Martin under arrest and handcuffed him, then later secured the firearm from under the passenger seat of the vehicle. After the conclusion of the video, Officer Radford returned Ms. Jarvis's weapon and released her without a citation. He

4

transported Mr. Martin to a family gathering a couple of miles away and spoke to his mother about the firearm, then released him, although he informed him that criminal charges were possible.

## STANDARD OF REVIEW

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005). On a motion to suppress, the burden of proof is on the party who seeks to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). However, once the defendant establishes a proper basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## DISCUSSION

The Defendant argues that Officer Radford's stop constitutes an unlawful seizure of Ms. Jarvis and Mr. Martin because he did not diligently pursue the purpose of the traffic stop. He contends that Officer Radford unlawfully extended the stop in order to engage in a firearms investigation. He contends that an inquiry into a passenger's criminal history is unrelated to the purpose of a traffic stop. He also argues that questions about firearms were unjustified because carrying a firearm is legal in West Virginia, Ms. Jarvis and Mr. Martin were outside the vehicle from the beginning of the stop, and Officer Radford's actions in allowing Ms. Jarvis to enter the vehicle without securing the firearm demonstrate that he was not concerned with officer safety. The Defendant argues that the time spent discussing ginseng, investigating the firearms, and checking criminal history records improperly extended the traffic stop.

The United States argues that the officer had a lawful basis for the traffic stop and that an inquiry into the criminal history of the driver and passenger was permissible. The United States cites Fourth Circuit precedent holding that a criminal history check is a permissible precaution during a traffic stop. In addition, it contends that the criminal history check caused only negligible delay. It argues that officer safety concerns further justify the criminal history check in light of the presence of firearms in the vehicle, and particularly because Ms. Jarvis denied the existence of additional weapons multiple times prior to acknowledging that there was a second firearm under the passenger seat.

The Fourth Amendment to the United States Constitution protects people against unreasonable searches or seizures. U.S. Const. amend. IV. Brief detention pursuant to a traffic stop constitutes a "seizure" for purposes of the Fourth Amendment and must therefore be "reasonable." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. "[T]he actual motivations of the individual officers involved" and their "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813 (finding pretextual stops permissible). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop," including checking ID, licenses, registration, and running a computer check. *United States v. Branch*, 537 F.3d 328, 335–36 (4th Cir. 2008). Extending a stop beyond the scope necessary to accomplish the purposes consistent with resolving the traffic violation requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.* at 336; *Rodriguez v. United States*, 575 U.S. 348, 355

(2015) (holding that extending a traffic stop even for only a few minutes to conduct a dog sniff absent reasonable suspicion constitutes an unlawful seizure).

There is no dispute here that Officer Radford had a legitimate basis to conduct a traffic stop based on Ms. Jarvis parking her car on a one-lane bridge. Although carrying firearms, including concealed firearms, is generally legal in West Virginia, an officer conducting a traffic stop is entitled to inquire about firearms or other hazards for officer safety. Officer Radford quickly learned that there was a firearm in the vehicle, obtained driver's licenses from Ms. Jarvis and Mr. Martin, and obtained the vehicle registration and insurance cards. He removed the firearm from under the driver's seat. While he was doing so, he again inquired about anything else in the vehicle, and learned that there was another firearm under the passenger seat. The conversation took place while he and Ms. Jarvis were occupied with necessary functions of the traffic stop— obtaining driver and vehicle information and securing the firearm for officer safety. Officer Radford then left the firearms in the vehicle, with Ms. Jarvis and Mr. Martin outside the vehicle, while he communicated with dispatch.[2]

Because of the lack of connectivity in the remote area, Officer Radford relied entirely on radio communications with dispatch and could not input information himself. He requested both driver history reports and criminal history checks to determine whether either the driver or passenger were prohibited from possessing the firearms in the vehicle. The Fourth Circuit has held that "[a] police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop," because these checks "further the strong interest in allowing an officer to complete

---

[2] The Court rejects the Defendant's suggestion that, by failing to take additional precautions to protect his own safety, Officer Radford forfeited the ability to use other tools courts have long approved to ensure officer safety during traffic stops. As an officer frequently patrolling alone in remote areas, however, securing firearms during traffic stops would be a wise precaution.

his traffic mission safely." *United States v. Palmer*, 820 F.3d 640, 651 (4th Cir. 2016). Even absent the binding precedent approving criminal record checks during traffic stops, Officer Radford testified that criminal history checks and driver history reports typically came back from dispatch at the same time.[3] The evidence, therefore, supports the conclusion that running the criminal history check did not extend the traffic stop. Conversation while awaiting a response from the dispatcher, likewise, did not extend the traffic stop. After the dispatcher radioed Officer Radford with the information that Mr. Martin had prior felony convictions, Officer Radford had probable cause to arrest Mr. Martin for being a prohibited person in possession of a firearm. Because Officer Radford developed probable cause for Mr. Martin's arrest while performing the traditional incidents of a routine traffic stop, without extending the stop for any purposes unrelated to the purposes of the traffic stop, the Court finds no violation of Mr. Martin's Fourth Amendment rights, and the motion to suppress should be denied.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Motion to Suppress All Fruits of September 6, 2022 Warrantless "Stop," Search, & Related Seizures* (Document 44) be **DENIED**.

The Court further **ORDERS** that the Defendant's *Motion to Schedule Evidentiary Hearing* (Document 53) be **TERMINATED AS MOOT**.

---

3 In this case, there was no separate call from dispatch with driver history information, and the dispatcher does not appear to have provided any direct information at all to confirm whether Ms. Jarvis had a valid license, although Officer Radford released her to drive home and returned the firearm. So, he presumably took the dispatcher's silence as confirmation that she had a valid license and was not a prohibited person. There was no testimony regarding normal practice in conveying the results of a driver's history or records check that revealed no negative information.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: October 4, 2024

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA